## INDIANA & OHIO LIVE STOCK INSURANCE COMPANY *v.* BENDER ET AL.

[No. 4,656.   Filed January 26, 1904.]

APPEAL.—*Pleadings.* — *Special Findings.* — *Review.*—Assignments of error as to rulings on pleadings need not be considered on appeal, where there were special findings by the court, and the same questions are presented upon assignment of error based upon the conclusions of law. *p. 288.*

PRINCIPAL AND SURETY.—*Failure of Principal to Disclose Former Embezzlement.*—*Discharge of Surety.*—An agent of an insurance company who had been guilty of embezzling funds of the company was appointed as agent of a new company formed with the same stockholders and officers, the new company taking a bond for the faithful performance of the duties of such agent. The new company having knowledge of his former embezzlement failed to give the sureties on the bond notice thereof. *Held,* that the sureties, having no knowledge of the former acts of embezzlement, were not liable on the bond. *pp. 288-295.*

SAME.—*Departure from Contract.* — *Discharge of Surety.* — Where an agent's contract provides that money collected by him shall be turned over to his principal at the end of each month, the failure of the principal to require monthly settlements, knowing that its funds were being misappropriated, will discharge the sureties. *p. 296.*

From Superior Court of Marion County (51,110); *J. L. McMaster,* Judge.

Action by the Indiana & Ohio Live Stock Insurance Company against Conrad Bender and others. From a judgment for defendants, plaintiff appeals. *Affirmed.*

*F. P. Mount, Albert Baker* and *Edward Daniels,* for appellant.

*D. W. Howe,* for appellees.

ROBY, J.—Action by appellant on bond, judgment for appellees. The first five assignments of error are based upon the action of the trial court in overruling demurrers to separate paragraphs of appellees' answer. A special finding of facts was made, and conclusions of law stated thereon, to each of which conclusions appellant duly excepted.

The questions arising upon demurrer to the answers, so far as they are relevant to the facts, are presented by the assignment of error based upon the conclusions of law, and it is therefore unnecessary to consider them as made upon the pleadings. *Woodward* v. *Mitchell,* 140 Ind. 406, 407; *Forgy* v. *Harvey,* 151 Ind. 507; *Smith* v. *Wells Mfg. Co.,* 148 Ind. 333.

The facts as exhibited by the findings are: The Indiana Live Stock Investment Company was organized in 1888, under the law of the State, for the purpose of insuring live stock. In 1890 Solomon Leopold was appointed a local agent for Marion county, with authority to take and forward applications for insurance to the company, which, if it approved the risks, issued and mailed policies to him for delivery, he collecting premiums thereon and accounting therefor to the company, receiving for his services twenty-seven and one-half per cent. of such premiums. The amount of premium was charged to him on the company's books when the policy was forwarded, and he was credited with the commission thereon. Further credits on the general account so kept were made when he paid money or returned policies for cancelation. On the first of each month a statement was sent to him, showing all charges and credits with the balance due. On March 10, 1893, the appellant company was incorporated, beginning business May 1. Its stockholders were identical with the stockholders of the stock investment company above referred to, both as to persons and amounts. It had the same officers and em-

ployes. Its office was at the same place, and its business was the insurance of live stock; its purpose being to cover the same field. For convenience the prior corporation is referred to as the "Old Company." The Old Company ceased writing policies the last day of April of said year, but continued its organization for the purpose of paying losses and winding up its business.

The appellant did not succeed to its assets, nor assume its liabilities, but its stockholders withdrew a portion of its assets as dividends, and applied the same to the payment of stock in the appellant company. The main purpose of the change being to take advantage of legislation relative to such business. On May 1, 1893, said Leopold was appointed agent for appellant, with the same powers and duties as under the Old Company. He was not under bond to the Old Company, but appellant required from him a bond with sureties conditioned for the faithful performance of his agreements and engagements "in the foregoing agreement." The bond in suit was attached to an agency contract between appellant and Leopold, hereafter referred to. E. M. Brewer was adjuster of both companies, his duties being to adjust losses, supervise agents, and to see that they faithfully accounted. The bond sued upon was prepared by Brewer and handed to Leopold who said he would have it signed by sureties who were financially good, but did not inform Brewer who any of the persons he expected to get as sureties were. The instrument was made by filling blanks in a printed form. It was filled up and handed to Leopold at Indianapolis, and two days later received by Brewer at the same city, it then bearing the names of appellees. Brewer examined the tax duplicate as to the financial standing of the sureties, satisfied himself that it was sufficient, and deposited the instrument in the defendant's home office at Crawfordsville, it accepting the bond, all within three or four days after May 1, 1893.

Neither appellant nor any of its officers had any acquaintance with any of appellees until some time after the bond was taken, but knew that all of them resided at Indianapolis. No communication was had with any of appellees on May 1, or for many months thereafter, nor did such officers see any of appellees during such period. No one acting for the company knew who the sureties were to be until Leopold delivered the bond; and appellant did not directly or indirectly request any of them to sign it, but it was signed by them at Leopold's request in appellant's absence. The only direction given by Brewer was to get the names of persons who were good financially. Leopold entered upon the employment of appellant under the terms of the contract contained in the said instrument on May 1, 1893, and continued therein until he was discharged August 6, 1894. The appellees in signing said bond relied upon the terms of the agency contract included therein. When Leopold was appointed agent for appellant he was indebted to the Old Company, on account of his agency for it, in the sum of $4,919.53, as appellant and its officers knew. During April, 1893, he paid nothing to appellant, although the net premiums with which he was chargeable amounted to $943.16 upon 126 policies forwarded to him upon applications received from him. Neither Leopold nor appellant, its officers or agents, gave appellees notice of his indebtedness to the Old Company, and they had no notice thereof until after Leopold's death, and no inquiry was made by them relative thereto.

During the six months following May 1, 1893, appellant delivered 500 policies to Leopold, charging therefor upon its books and in its monthly statements to him $5,661.94. The gross premiums thereon deducting on account of commission and other credits left $3,694.71 still due. The only cash paid by him during such period was $85, paid in August. During the same period he remitted to Henry Naylor, who was bookkeeper for both corporations, $1,040

Indiana & Ohio Live Stock Ins. Co. v. Bender.

in cash, directing that the sum be applied on his indebtedness to the Old Company, and it was so applied. Naylor did not know from what source such money was secured. Leopold had no other income during the period than that derived from his agency for appellant, and the court infers that the amount so paid was received by him on business done for appellant. On February 1, 1894, Leopold's balance to the Old Company was $3,500, for which he then executed his note with indorsers other than appellees. Such note is unpaid and probably worthless. The failure of Leopold to pay on account to appellant began May 1, 1893, and continued until August, 1894. Appellant's system of bookkeeping exhibited the names of policy holders, the serial number of policies, and the amount of premiums. In sending money Leopold did not designate what particular premium it represented, except when sent in connection with a canceled policy. At the close of each month it rendered him a detailed statement of his account, showing the balance due and all items and details thereof. The gross premiums on policies written by him averaged $10.87 on each policy, and the net premium averaged $7.88. During the six months following May 1, 1893, appellant's adjuster had frequent interviews with Leopold, urging him to pay the balance due. In some of the first interviews Leopold claimed that many of the policies sent to him had not been delivered, and that he had failed to make collections. November 1, 1893, the adjuster became more pressing, and insisted that undelivered policies be sent in and credited. Many of the persons insured were known by the appellant to be solvent business men. It made no inquiry of any of them as to the payment of premiums to Leopold, nor was any demand made upon him to exhibit undelivered policies. When Leopold executed the $3,500 note he admitted that he had converted said amount. Afterward the adjuster heard of his squandering money collected, in drinking, and probably in gambling, and reported such information to

appellant. Afterward, and before August 6, 1894, the adjuster several times threatened Leopold that unless the indebtedness was reduced he would inform the sureties of it. Leopold begged him not to do so, and stated that if he did he would kill himself. These facts were reported to appellant, and pursuant to the request of Leopold, and his promise to pay off the indebtedness as rapidly as he could, neither appellant nor its adjuster communicated the fact of such indebtedness to appellees.

On August 6, 1894, Leopold admitted the conversion of the amount charged against him, and was discharged, being at once reëmployed jointly with his son, who was to handle the money. On November 22, appellee Kahn was notified by appellant of the amount of said indebtedness. Prior thereto he had no notice thereof, nor was any notice given to the other appellees, nor did they have any knowledge of the indebtedness, nor that Leopold had been discharged at any time after the execution of the bond, until after Leopold's death, which occurred January 20, 1895. No monthly settlement was had by appellant with Leopold, as provided by the contract. Just prior to his discharge appellee Kahn asked to be released from further liability, and thereupon appellant demanded an accounting from Leopold, who paid $250, and admitted that the rest of the money had been used for his own purposes. Appellees made no inquiry at any time relative to the state of his accounts. Appellant knew nothing about the financial standing of Leopold prior to May 1, 1893, and relied upon the bond in suit. He was insolvent at all times, and left no estate. He had no source of revenue except the insurance business during the entire time referred to herein. The monthly statements rendered after May 1, 1893, did not include the old account or balance. Payment of the amount due from Leopold was demanded from appellees prior to the institution of this action. Such sum is due and unpaid. The appellant knew Leopold was a defaulter to the Old Company when the

bond in suit was executed. It also knew that he was a defaulter to it on July 1, 1893; his indebtedness on that day amounted to $1,830.85. Appellant did not discharge him, nor notify the sureties of his default, "and the court finds that such failure * * * was an act of bad faith on the part of plaintiff toward said defendants, and was a fraud on their rights as sureties."

The agency contract and the bond in suit must be considered and construed together. *Williams* v. *Markland*, 15 Ind. App. 669-671; *Jenkins* v. *Phillips*, 18 Ind. App. 562.

The terms of the bond with Leopold and appellees were as follows: "In consideration of the foregoing appointment of Leopold as agent, * * * and of the compensation to be paid said agent under the foregoing agreement, we undertake and agree to and with said company that said Leopold will faithfully and fully perform all engagements and agreements in the foregoing agreement, * * * and hereby bind ourselves jointly and severally with said agent for the full performace of all said agreements." This contract was one of suretyship, and not of guaranty. *Wittmer Lumber Co.* v. *Rice*, 23 Ind. App. 586; *Wheeler* v. *Rohrer*, 21 Ind. App. 477; *Durand & Kasper Co.* v. *Rockwell*, 23 Ind. App. 11.

The facts found show that the agent, at the time of the execution of the bond in suit, was guilty of embezzlement as defined by statute. §2022 Burns 1901. The intent necessary thereto is inferable from the failure to pay to them at any time either the funds of the Old Company or appellant's funds, such failure being considered in connection with the circumstances shown and statements made by the agent relative thereto. His conduct as agent for the Old Company can not, in view of the peculiar facts of this case, be disassociated from appellant. The effect of the defalcation was not different than it would be had there been no change in the corporate name or organization.

Where an employe has been guilty of criminal conduct or conduct implying moral turpitude in the employment on account of which a bond for his faithful discharge of duty is about to be taken, the employer and obligee having knowledge thereof, his duty, as stated by the court of appeals of New Jersey, is "to disclose the past malpractices of such employe in the course of the business to which the guaranty relates, and that if such duty is not performed, the instrument so taken is, *ipso facto,* invalid. The continuance of an agent in an employment is an act so expressive of trust and confidence that it is tantamount to an express declaration to that effect, and hence it must, under usual circumstances, have all the effect of a meditated fraud, if the person so retaining the agent can be permitted to disown the implications inevitably arising from his own conduct." *Sooy* v. *State,* 39 N. J. L. 135, 147.

"The bad faith, in withholding from the guarantor such information, so material to the risk assumed, is manifested not only by the fact that the dishonest character of the agent was peculiarly within the knowledge of the principal; but the holding of him out as a person entitled to confidence by continuing him in the service, was equivalent to a declaration that the principal had no knowledge of the dishonesty of the agent." *Dinsmore* v. *Tidball,* 34 Ohio St. 411, 418.

The doctrine stated is supported by the following, among many cases that could be cited, the facts involved being in line with those in the case at bar, and the reasoning therein contained cogent. *Franklin Bank* v. *Cooper,* 36 Me. 179-196; *Connecticut, etc., Ins. Co.* v. *Chase,* 72 Vt. 176, 47 Atl. 825; *Graves* v. *Lebanon Nat. Bank,* 73 Ky. 23, 35, 19 Am. Rep. 50; *Smith* v. *Josselyn,* 40 Ohio St. 409; *United States Life Ins. Co.* v. *Salmon,* 36 N. Y. Supp. 830; *Wilson* v. *Town of Monticello,* 85 Ind. 10-17.

The preparation of an agency contract and bond and its delivery for the purpose of enabling the agent to procure

suretyship of such persons as he might be able to induce to take the risk, were acts affirmative in nature, and were calculated to obscure the facts and mislead the sureties, whoever they might be. Appellant's insistence that it did not know who was to sign the bond, and had no opportunity to communicate its special information to them, can not be regarded. It is neither necessary nor competent, in view of the findings, to consider the duty of the employer, where the facts, known to him, and reflecting upon the integrity of his employe, fall short of establishing criminality.

A further proposition pertinent to the facts has been stated by the Supreme Court as follows: "That the retention in service of one whose conduct and fidelity are guaranteed by another, after knowledge by the employer of his dishonesty, or defalcation, or other misconduct, which renders him unfit for the place, without disclosing the fact to the guarantor, is such a fraud upon the latter as will discharge him from all subsequent liability, is well settled." *LaRose* v. *Logansport Nat. Bank,* 102 Ind. 332, 343.

In the language of Bleckley, J., of the supreme court of Georgia: "When a thief is detected, confidence ought to be withdrawn, at least until those who are likely to be injured by his larcenies have been warned. To persist in supplying him with money after he has made up his mind to steal, and you know it, is contrary to sound morality, unless you mean to bear the loss yourself." *Charlotte, etc., R. Co.* v. *Gow,* 59 Ga. 685, 694, 27 Am. Rep. 403.

The following cases sustain the proposition stated in *LaRose* v. *Logansport Nat. Bank, supra; Lancashire Ins. Co.* v. *Callahan,* 68 Minn. 277, 71 N. W. 261, 64 Am. St. 475; *Pacific Fire Ins. Co.* v. *Pacific Surety Co.,* 93 Cal. 7, 13, 28 Pac. 842; *Capital Fire Ins. Co.* v. *Watson,* 76 Minn. 387-390; *Roberts* v. *Donovan,* 70 Cal. 108, 9 Pac. 180.

The liability of a surety is, as has often been decided, strictly limited to the terms of the contract executed by

him. He has the right to stand upon the precise terms of the contract, and if a variation is made without his consent it is fatal, although he sustains no injury thereby. *Post* v. *Losey,* 111 Ind. 74, 60 Am. Rep. 677; *Weir Plow Co.* v. *Walmsley,* 110 Ind. 242.

Where the contract is for the payment of money at a stated and definite time, mere forbearance to sue when the debt becomes due does not release the surety. *Kirby* v. *Studebaker,* 15 Ind. 45; *Barnes* v. *Mowry,* 129 Ind. 568, and cases cited; *McKecknie* v. *Ward,* 58 N. Y. 541, 17 Am. Rep. 281.

The agency contract for the performance of which appellees became sureties in the case was a continuing one. *Jenkins* v. *Phillips,* 18 Ind. App. 562; *McKecknie* v. *Ward, supra.* According to its terms "all collections made on any account, or money received from any source, for said company by said agent during any month shall be by him promptly paid over to said company at the end thereof, and all moneys so collected for said company shall be held by said Leopold, and be and remain the money of said company, and shall be held by said Leopold in a fiduciary capacity only." The findings show an utter disregard of this part of the contract persisted in month after month by appellant, when it knew that its funds were being misappropriated by the agent. The waiver of such payments has been held to be a departure from the contract to secure the performance of which bond was given, and therefore to discharge the sureties on such bond from liability. *Fidelity Mut. Life Assn.* v. *Dewey,* 83 Minn. 389, 86 N. W. 423, 54 L. R. A. 945; *Burley* v. *Hitt,* 54 Mo. App. 272; *Rapp* v. *Phoenix Ins. Co.,* 113 Ill. 390, 55 Am. Rep. 427; *Morrison* v. *Arons,* 65 Minn. 321, 68 N. W. 33; *Board, etc.,* v. *Branham,* 57 Fed. 179; *Bragg* v. *Shain,* 49 Cal. 131.

Each of the three propositions stated is applicable to the facts found, and, taken collectively, it seems to be reasonably apparent that appellant ought not at this time to

require appellees to make good the loss, and that the conclusions stated by the trial court were not incorrect.

It is argued in support of the assignment of error based upon the action of the court in overruling the motion for a new trial that there was no evidence to support the finding that appellant had knowledge of the various delinquencies of the agent. Such findings are based upon inferences drawn by the court from facts proved, and it cannot be said that they were not fair inferences.

Judgment affirmed.