LARMORE *v.* PEOPLES STATE BANK.

[No. 25,554.   Filed January 5, 1934.]

*Bagot, Free & Pence,* for appellant.

*Philip B. O'Neil* and *L. R. Zapf,* for appellee.

FANSLER, J.—This action is upon a promissory note executed by the appellant and Warren T. McCray in favor of the appellee. No service was had on the defendant, McCray, and the cause was continued as to him.

Appellant answered in five paragraphs; general denial, want of consideration, failure of consideration, voluntary suretyship and discharge by reason of fraudulent concealment of material facts by the payee, and failure to reveal material facts affecting the obligation known to the payee and unknown to the appellant. The fourth and fifth paragraphs are both designed to set up the defense last mentioned, the fifth being more extended and specific in the facts alleged. The error assigned relates to the overruling of the motion for a new trial, upon the ground that the decision is not sustained by sufficient evidence and is contrary to law.

There is but little dispute in the evidence. The facts proven and the inferences reasonably to be drawn therefrom are hardly sufficient to prove all of the allegations of the fourth or fifth paragraphs of answer, which are the ones relied upon, but it is contended by appellant that they are sufficient to have required a finding and judgment in his favor.

The fifth paragraph of answer alleges that appellant was an uncompensated surety and McCray the principal on the note in question, although both signed as principals; that prior to the execution of the note in suit McCray had negotiated to the appellee certain forged and spurious notes, forged by the said McCray, which notes purported to be signed by a corporation or partnership by one Hendry, Manager; that appellee

had discovered that the said notes were spurious and forgeries and had procured the affidavit of Hendry to the effect that he had not signed said notes, and that appellee had threatened McCray with prosecution for forgery; that the note in suit was a part of the transaction by which McCray retired and took up the spurious notes and the affidavit showing his wrongful and unlawful connection therewith; that with full knowledge of the facts, appellee allowed and permitted McCray to procure appellant to become surety on the note in suit for the purpose of taking up and retiring the spurious notes in question and the proof of his unlawful connection therewith, together with other obligations which said McCray had executed to the appellee; that Warren T. McCray was then Governor of the State of Indiana and reputed, and believed by appellant, to be a man of great wealth and business ability, and of high financial, business and political standing; that had the facts concerning the forged instruments been communicated to appellant he would not have signed the note, and that failure to disclose these facts operated as a fraud upon appellant.

It appears by the evidence that McCray had negotiated to the appellee two certain notes of $4,000.00 each, signed "Morgan County Stock Farm, W. J. Hendry, Manager," and one note of $2,000.00 signed by A. E. Harriman Co., all payable to Warren T. McCray, and that he had endorsed said notes, and in consideration thereof had obtained $10,000.00 from appellee. That in addition thereto he was indebted to appellee in the sum of $20,000.00, evidenced by his unsecured promissory note or notes. That all of said notes were due. That some time prior to the day on which the note in suit was signed, an officer of and an attorney for appellee had visited W. J. Hendry, who had told them, and made an affidavit to the effect, that

he had not signed the notes in question or written the name "Morgan County Stock Farm," or "W. J. Hendry, Manager," upon said notes.

Hendry testified as a witness to the effect that he had not signed the notes or written the signature thereon. He testified that he lived at Kentland; that he was thirty years old, and a farmer; that part of the time he cultivated a farm known as the Morgan County Stock Farm, which was supposed to be in the name of Warren T. McCray; that he was on a salary and commission while he occupied the farm; that he went on the farm in August, 1921, and stayed there until 1924; that representatives of the appellee had inquired how much land he farmed and how much stock he had; that he told them; that the affidavit was prepared and signed by him without reading, and that he was sworn to it; that he and McCray bought stuff in the name of the farm; that he was manager; that "we both felt free to buy stuff for the farm. Neither made objection to what the other did." That on the afternoon the note in suit was signed McCray gave him the affidavit which he had signed for the representatives of the appellee, and that he took it home and burned it that evening.

On the day the note was signed Warren T. McCray and his attorney went to appellee's office where they met the appellee's president and attorney and two other representatives of appellee. Appellee, through its president, demanded that McCray pay his entire indebtedness to the bank immediately. The notes above described and the affidavit of Hendry were on the table where the conference was held. McCray tendered a check for $10,000.00, drawn on an Indianapolis bank, in payment of the two $4,000.00 notes and the $2,000.00 note. The check was not accepted, but was sent out to be certified. The president of appellee insisted that the entire $30,000.00 of indebtedness be taken up. McCray

said that two friends were coming to town who were good and who would sign as his sureties for the remaining $20,000.00 of indebtedness. Appellee's officers refused to delay the settlement. McCray left to find someone to sign as surety. He returned with appellant. Appellant was vice-president of the Farmers Trust Company of Anderson, and that morning, acting for his company, had accepted McCray's note for $10,000.00, which was the $10,000.00 on deposit in the Indianapolis bank to cover the $10,000.00 check above referred to. Appellant returned to appellee's office with McCray. Again, in appellant's presence, the amount of McCray's indebtedness to appellee was made known, and again McCray advised appellee that two friends, naming them, were expected in Indianapolis at any time, and that within a few days at most they would sign as his surety. Appellee's president then again advised McCray in appellant's presence that appellee would not wait; that the indebtedness must be taken up immediately. The $10,000.00 check was discussed, and it was suggested that McCray's attorney and appellant sign as surety for McCray for $20,000.00 to take up the remainder of the indebtedness. It was arranged that McCray's attorney would sign as surety for $10,000.00, and appellant sign a separate note for $10,000.00 as surety, which was done. The $30,000.00 of notes and the affidavit of Hendry were then delivered to McCray. No mention of the affidavit of Hendry was made in the conference, and appellant had no knowledge of its existence. McCray stated in the conference, in the presence of appellant, that he had ample property to pay all of his obligations and have a fortune left.

It was shown that McCray was at the time Governor of Indiana; that for years prior to and at said date McCray was generally known within the State of In-

diana as a man of great wealth and business ability, and well known to the appellee as a man of great wealth, great business ability, and high financial, political and business standing; and that appellant had no notice or knowledge that McCray was in failing circumstances, or that he was guilty of any crime against the state, or that he had committed forgery.

It appears inferentially from the evidence that prior to the time of trial Warren T. McCray had been indicted, possibly in connection with the Morgan County Stock Farm notes, but insofar as the facts affect the charge of fraud on appellee, we must consider them from the standpoint of appellee's officers on the day the note in suit was signed. From the evidence, it does not appear that at that time there was any evidence that Warren T. McCray had committed forgery, other than that furnished by the affidavit of Hendry, that he had not signed the notes which bore his name. As against that evidence, when viewed from the standpoint of appellee on the date in question, must have been the fact that McCray was the Governor of Indiana and that, as alleged by appellant, he was reputed a man of great wealth and business ability, and of high financial, political and business standing. Appellee had had sufficient confidence in him to lend him $20,000.00 upon his unsecured notes, and to discount $10,000.00 of other notes, apparently without inquiry as to their genuineness. Whether appellee, through its officers, discussed the genuineness of the Stock Farm notes with McCray after procuring the affidavit of Hendry, is not disclosed by the evidence. If they were discussed with him, his explanation, if any, is not disclosed. If he had been indicted for a crime, the evidence of Hendry, and the fact that the notes had been made payable to McCray, and that he had endorsed and negotiated them, unexplained, might have been sufficient to sustain a

conviction, but he had not then been indicted or charged with any crime. Appellee was not required to confront McCray with the information which it had. It had the right to simply demand that he pay his obligations and take up the notes in question. Appellee's officers may have believed the facts stated in Hendry's affidavit, or they may have disbelieved them, and believed that Hendry was seeking to avoid liability upon an obligation for which he as well as McCray might have been liable. Upon the one hand they had Hendry's affidavit that he had not signed the notes. Upon the other hand, by discounting the notes McCray had, impliedly at least, warranted their genuineness. He was then a citizen of the highest standing. The fact that he discounted the notes may have carried more weight with appellee's officers than the affidavit of an unknown person; and yet for other reasons, and not doubting the integrity or solvency of McCray, they may have earnestly desired that all of the McCray obligations be paid. There is nothing in the evidence to show what motive prompted appellee's insistence upon immediate payment. It may be that Hendry's repudiation of the notes in question raised doubts which prompted the demand for immediate payment, although it did not create a belief in McCray's guilt. Upon the facts before it, as disclosed by the evidence, the appellee might have hesitated to assert that McCray, the Governor of Indiana, a man of good reputation, was guilty of forgery, or that he was insolvent, or that his statement that his assets were sufficient to pay his indebtedness and leave a fortune was untrue, and yet its officers might have felt it advisable to insist on payment or security. Appellant was a stranger to appellee's officers; he came into their conference and signed the note voluntarily and without invitation or suggestion from appellee. He was a man of affairs, vice-president of a bank, educated as a law-

yer, active in business. That morning he had acted for his bank in lending McCray $10,000.00. It must have been apparent to him that there was something unusual in the conference. The appellee was represented by its president and attorney and two other officers. McCray was accompanied by his attorney. The conference had obviously been in session for some time and had continued in session awaiting McCray's return. The $10,000.00 check had been certified, which would seem an unusual precaution in the case of a man of McCray's standing. Appellee's president insisted on immediate payment or security for all of McCray's obligation, refusing flatly to wait even a few days. It is not disclosed that appellant asked any questions or sought any information in the face of these unusual circumstances. There is evidence that he stepped aside and conferred privately with McCray during the conference. It may well be that appellee's officers believed that McCray had disclosed all of the circumstances to his attorney and to the appellant.

Appellant relies upon his fourth or fifth paragraph of answer, and contends that "an uncompensated surety is entitled to perfect frankness and fairness at the hands of the obligee of the contract, and any concealment of any material matter pertaining to the transaction involved by the obligee from the surety, will relieve the surety of liability." Most of the cases which he cites involve sureties upon fidelity bonds. It will be observed, however, that the relationship between the beneficiary and the surety upon a bond, and the payee and the surety upon a note, is not the same. Where an employee has been guilty of criminal conduct affecting an employment, on account of which a bond for the faithful discharge of his duty is to be taken, the employer, having knowledge of the fact, must disclose the past malpractices to the prospective

sureties. The continuance of an agent in employment is in itself an act as expressive of trust and confidence as an express declaration, and to permit a surety to become responsible for future malpractices without a full disclosure of the past, has been treated as having the effect of a meditated fraud. On the other hand, a surety upon a note guarantees that the maker will pay, and the payee ordinarily does not sustain a relationship to the maker that carries with it any implication of confidence.

Where one selects his own fiduciary and asks for a bond with sureties, it is impliedly holding the fiduciary out as worthy of confidence. *Indiana & Ohio Live Stock Insurance Co.* v. *Bender et al.* (1903), 32 Ind. App. 287, 69 N. E. 691.

Where one asks for surety on a note which promises the payment of money, he is impliedly representing that he has not sufficient confidence in the principal maker to take his note unsecured.

It is well settled that one who is asked to become a surety must exercise reasonable diligence to know the circumstances of the transaction and the condition of his principal, and if he is put upon his guard by circumstances surrounding the transaction, and can upon reasonable inquiry ascertain all of the facts necessary to shield himself from loss, he is bound to make the inquiry. He must not suffer himself to become an indolent victim of fraud. *Jacob Magee et al.* v. *Manhattan Life Ins. Co.* (1875), 92 U. S. 93; *Stedman et al.* v. *Boone* (1875), 49 Ind. 469; *Jones* v. *Swift et al., Executors* (1883), 94 Ind. 516.

It is the further rule that to relieve a surety of liability, the uncommunicated facts must necessarily have the effect of increasing the surety's financial responsibility, or otherwise affecting his liability to his detriment, and the failure to communi-

cate must be such as to amount to fraud under the circumstances. *Fassnacht* v. *The Emsing Gagen Co.* (1897), 18 Ind. App. 80, 46 N. E. 45, 47 N. E. 480.

> In order to effect a fraud the undisclosed facts must bear directly upon and become directly connected with the transaction to which the suretyship attaches.

The payee of a note is under no obligation to disclose to a proposed surety facts in no manner connected with the transaction, although such facts might influence the surety and prevent his having entered into the contract. If the surety on a note is not deceived by representation or the withholding of facts as to the character of his contract, the amount for which he is to become responsible, and the consideration for the note, he cannot be relieved of responsibility. Where one owes no duty to disclose, there can be no fraud predicated upon the failure to disclose facts.

Whether fraud is established as a defense must be determined from the facts in the particular case, considered in the light of the relationship of the parties and the principles of law above suggested. It is not shown that McCray misrepresented his financial responsibility to the knowledge of appellee, nor that the appellant was deceived concerning, or did not fully understand, the nature of the contract into which he entered, the extent of his responsibility, and the consideration for the note. The only matter upon which it is sought to predicate fraud is in connection with the allegation that McCray was guilty of forgery and that the note was given for the purpose of taking up forged paper.

The facts do not disclose that appellee had definite knowledge that McCray had committed a forgery or had been guilty of other unlawfulness. That it was insisting upon the immediate payment of McCray's

obligations, notwithstanding it had previously extended him credit for many thousands of dollars without security, was not concealed from appellant, nor is there any evidence of any effort to conceal or disguise the definiteness of the demand or the insistence upon immediate payment in the face of McCray's assurance that he would have willing sureties within a day or two. The most that can be said to have been withheld was the sworn statement of Hendry concerning the notes. This was sufficient to create a strong suspicion in the minds of appellees' officers, but it cannot be said as a matter of law that it was sufficient to establish forgery as a fact. The affidavit might conceivably have been false and made in an effort to avoid some responsibility of the affiant's in the premises.

Appellant was a man of affairs, vice-president of a bank, educated as a lawyer, and familiar with business transactions. That morning he had acted for his bank in making a loan to and accepting a note from McCray. When he went to appellee's office with McCray he found a closed conference waiting for him, one which McCray had left obviously for the purpose of obtaining help. The conference was made up of four representatives of appellee, including its president and attorney, and McCray and his attorney. This would seem a rather unusual background for the ordinary renewal of an obligation. No representations were made by appellee or its officers concerning McCray's financial responsibility. McCray did make statements concerning his holdings and obligations, and, notwithstanding these, appellee's officers insisted upon immediate settlement. These facts alone must have suggested to appellant that appellee's confidence in McCray's responsibility had diminished, and that it was less than when the original transactions were entered into. If they were sufficient to put a man of appellant's experience and

knowledge of affairs upon inquiry in the exercise of due diligence, and he failed to take advantage of the present opportunity to inquire and inform himself as to any and all of the facts surrounding the transaction, he cannot be heard to complain or escape liability upon the ground that he was defrauded.

The court below heard the evidence and decided the issue of fact against appellant, and we cannot say that the facts do not sustain that judgment or that it is contrary to law.

The appellee parted with a valuable consideration. If the appellant had not signed the note in question, appellee might have collected the amount due it by proceeding promptly before insolvency, or have otherwise protected itself.

The judgment is affirmed.